IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

No. 1:19-cv-00954

| | | |
|---|---|---|
| JAMES MALLON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | (Jury Trial Demanded) |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff James Mallon, complaining of the acts of Defendant International Business Machines Corporation ("IBM"), alleges and states the following:

## PARTIES

1.     James Mallon is a citizen and resident of Leesburg, Virginia.

2.     IBM was incorporated, and is existing, under the laws of the State of New York. IBM's principal place of business is in the State of New York.

## JURISDICTION AND VENUE

3.     Subject matter jurisdiction over this matter is conferred upon and vested in this Court under 28 U.S.C. § 1332.

4.     This Court has personal jurisdiction over IBM.

5.     Venue is proper in this Court.

6.     This action has been brought within all applicable statute of limitations and/or repose.

## FACTUAL ALLEGATIONS

7.      Mr. Mallon is an experienced software sales representative who worked at IBM from 2015 through January 2018.

8.      Mr. Mallon joined IBM on or about June 1, 2015 as an account executive.

9.      During his tenure with IBM Mr. Mallon was very successful and highly respected in his position and received positive ratings in every performance review. Mr. Mallon received awards for IBM Blue Points and 100% quota club.

### IBM Promised Mr. Mallon His Commissions Were Uncapped.

10.      Mr. Mallon's compensation as an IBM sales representative consisted of a base salary paired with uncapped commissions. His commissions consisted of varying percentages based on products sold. Mr. Mallon's commission plan for the first half of 2017 ran from January 1, 2017 through June 30, 2017. Upon information and belief, IBM offered the written (electronic) commission plan to Mr. Mallon ("the Incentive Plan Letter" or "IPL") sometime in February or March 2017.

11.      Around the time that Mr. Mallon accepted the IPL, IBM presented to him and similar salespeople a PowerPoint presentation describing the terms of the commission plan being offered to them. Upon information and belief, IBM presented the PowerPoint to Mr. Mallon both before and after the IPL was presented to him. The PowerPoint was also available for Mr. Mallon, and other salespeople, to download during the entirety of the sales period (January-June of 2017) and afterwards.

12.      IBM made a substantially similar version of this PowerPoint available to Mr. Mallon each year for the purpose of explaining the important terms of his compensation.

13.     The PowerPoint for the Second Half of 2017 Sales Period (July-December) was titled "Your 2017 Incentive Plan" "Individual Quota Plan (IQP – Employees" and it stated that the goal of the incentive plan is "to ensure that our incentives plans were competitive, if not best-in class." In particular, page 10 of the PowerPoint reads as follows[1]:



14.     Under "2017 Individual Quota Plan Highlights," each of the bullet points highlights how commissions are paid during the 2H 2017 sales period for various sales roles, with the role applicable to Mr. Mallon specifically stating clearly "**Payments uncapped**." (emphasis added). In fact, the presentation mentions no less than fourteen times in its 27 pages that "payments" and/or "earnings opportunit[ies]" are "uncapped."

---

[1] This screenshot, as well as the quoted language in these paragraphs, come from the PowerPoint for the sales period beginning in July 2017 and ending December 31, 2017.  The sales period that Mr. Mallon is complaining about was January 1, 2017 through June 30, 2017, but the PowerPoint for that period was in relevant part identical to the PowerPoint for the second half of 2017.  Most importantly, both PowerPoints—and all of the other PowerPoints that Mr. Mallon received while at IBM—represented that his commissions were "uncapped."

15.     Moreover, IBM represented to Mr. Mallon and its other sales representatives in writing in these PowerPoints that "**Seller earnings for these plans are uncapped and the plan is paid based upon achievement results rather than on an assessment of employee contribution**." (emphasis added).

16.     These representations were repeated in sales meetings that Mr. Mallon attended and by IBM managers to Mr. Mallon.

17.     Indeed, even IBM's written guidance to its managers for dealing with situations in which an adjustment may be made based on errors or other issues makes it blindingly clear that no caps are allowed:

> Conditions that may lead to an adjustment include the need to correct errors or the need to balance with employee's contribution to the success of a large sales transaction (which criteria must be clearly provided to Commissions team).
>
> **Adjustments must not be done only as a ceiling or cap on the total earnings allowable to employees.**

(Emphasis added).

18.     In other words, IBM's official policies provide that sales representatives commissions may be adjusted to correct errors, but their commissions may not be arbitrarily capped for the purpose of limiting the employee's earnings.

19.     Here, Mr. Mallon's commissions were not adjusted as a result of any errors or to balance his contribution.  Furthermore, his commissions were not adjusted under the "Significant Transactions Provision" of his IPL Rather, Mr. Mallon's commissions were arbitrarily capped for the sole purpose of limiting his earnings.

### Mr. Mallon's Commission Payments Were Capped in 2017.

20.     In 2017, Mr. Mallon worked on behalf of IBM to close a large deal of IBM software and technical support of that software with the United States Marine Corps ("USMC Deal").

4

Indeed, until a director "forced" his way in towards the end of the sale, Mr. Mallon was the sole sales representative for this account and his brand was the only brand being sold to the account, and Mr. Mallon worked diligently to close a deal for this IBM software and technical support.

21.     Mr. Mallon had begun working on this deal in the fall of 2015, with an eye toward closing the deal in the spring of 2017.

22.     His work on the deal was extensive, and he spent countless hours working to close the deal. This included sacrificing time with his family on many nights and weekends and frequent travel out of state

23.     In October or November 2016, Mr. Mallon told executive leadership that he was close to closing the deal and that the client agreed it would be done by the end of the next half (meaning the spring of 2017). He internally forecast that the deal would close and expressed this through direct communications with IBM executives Michael Falkowski and/or Tom Cowell.

24.     Shortly after this, around the beginning of 2017, IBM executives Michael Falkowski and Tom Cowell approached Mr. Mallon regarding this deal. They told him that IBM wanted to move the deal into a Target Account Absolute Plan ("TAAP"), but that they could keep it on his normal commission plan if he preferred that. They informed him that if he kept it on his normal commission plan, IBM would be allocating an additional $1.7 million of quota specifically to the Marines, something that IBM had never done before. Historically, the Marines had simply been designated as one account with the Navy quota assigned to Mr. Mallon.

25.     Based on the $1.7 million quota that would be assigned if Mr. Mallon kept the Marines as a regular commission account, he was projected to earn approximately $695,000 in commissions when the deal closed. However, under the TAAP, Mr. Falkowski and Mr. Cowell informed him that there would be a commission pool of $744,000 available to all sales

representatives who worked on the deal. They assured him that since he was the only sales representative responsible for the deal, he would receive the full amount of the commission pool.

26.     Based on these discussions, Mr. Mallon elected to have the Marines account moved into a TAAP.

27.     In either Feb or March of 2017, IBM told Mr. Mallon that the USMC Deal was being assigned to a TAAP and Mr. Mallon thereafter received a new IPL.

28.     IBM knew that Mr. Mallon had all but inked the contract for this sale when it assigned it to a TAAP.

29.     Mr. Mallon's effort in closing the USMC Deal resulted in a total sale of approximately $34,000,000 of IBM products and services over five years. Of that $34 million, $24.5 million was over the first 3 years, and $15.6 million was to be paid in the first year. Mr. Mallon was to be credited for 3 years of revenue.

30.     On the recognized revenue amount of $24,500,000, Mr. Mallon would have earned commissions of approximately $695,000 under the formula that usually applied to his sales under his normal commission plan. However, as IBM executives had previously discussed with him, the amount of commissions that were available under the TAAP was $744,000, which should have all been paid to him because he was the sole sales representative who contributed to closing the deal. This should have been paid to him in July 2017, after the deal was closed at the end of June 2017. He was not paid any of this commission at the end of July as he should have been.

31.     After approaching his manager regarding this, his manager informed him that it was up to IBM's executive leadership (Kelly Collins) to split up the commissions bucket amongst the individuals involved in the USMC Deal.

32.     Following this process, Mr. Mallon was informed that IBM would only be paying Mr. Mallon $394,000 in commissions for the USMC Deal.

33.     Neither his first line manager, Tony Franzonello, or his second line manager, Michael Falkowski, were consulted as part of this allocation process. To the contrary, after the fact Mr. Falkowski approached the executive leadership to contest the allocation of the commission pool. It was his belief that Mr. Mallon was the only sales representative who contributed to this deal, and that he should have received the entire allocation of the commission pool.

34.     Mr. Mallon was the only sales representative responsible for the USMC Deal, which IBM recognized had $24,500,000 in attributed revenue for purposes of calculating commissions.

35.     However, at least a portion of the $350,000 was paid to two other IBM employees: one was an individual on the technical team who had no role in the USMC Deal, and the other was a director, who was not eligible for TAAP pool payments as set forth in PowerPoints created by IBM that explained the TAAP.

36.     IBM's decision to move the USMC into a TAAP, and to not pay Mr. Mallon the full $744,000 amount of commissions, was done for the sole purpose of limiting Mr. Mallon's income.  In other words, IBM "capped" his commissions.

## Mr. Mallon Has Recently Learned That IBM
## Routinely Breaks its Promise Not to Cap Commissions

37.     Recently, Mr. Mallon has learned that IBM has a history of capping the commissions on large sales.

38.     The sales field in which Mr. Mallon worked for IBM is highly competitive, and most employers do not cap commissions. Were IBM to actually tell its salespeople that commissions could be capped, it would be severely hampered in its efforts to recruit good salespeople. As a result, IBM engages in a practice whereby it tells its salespeople that their commissions will not be capped, both verbally and in written documents like the PowerPoint presentation, and then it caps certain high-achievers after the fact.

39.     There are other cases pending, in the Middle District of North Carolina and the Northern District of California, that are very similar to this one and that have yielded significant discovery.  One of those cases is <u>Bobby Choplin v. International Business Machines Corporation</u>, No.  16-cv-1412-TDS-JEP ("the Choplin Action"), which was recently resolved.   Upon information and belief, the plaintiff in the Choplin Action had an IPL that was in relevant part identical or substantially similar to Mr. Mallon's IPL, and the plaintiff was shown a PowerPoint presentation that was in relevant part identical or substantially similar to the PowerPoint presentation shown to Mr. Mallon. Furthermore, upon information and belief, many of the other facts and circumstances surrounding the commissions due to Mr. Choplin, and what IBM actually paid him and why, are similar to the facts and circumstances surrounding the commissions due to Mr. Mallon, and what IBM actually paid him and why.

40.     In the Choplin Action, the plaintiff took four depositions: (1) a Rule 30(b)(6) deposition of IBM, through corporate designee Richard Martinotti (**Exhibit A**); (2) a deposition of Mr. Choplin's first-line (i.e., immediate) manager, Thomas Batthany (**Exhibit B**); (3) a deposition of Mr. Choplin's second-line (i.e., two levels up) manager, Haleh Maleki (**Exhibit C**); and (4) a deposition of Mark Dorsey, a former IBM Vice President of Software Sales (i.e., one of

the highest-level sales managers in the corporation) (**Exhibit D**).  Together, Exhibits A, B, C, and D are referred to as the "Choplin Depositions."

41.     The testimony in the Choplin Depositions make clear the following, among other things: (1) because of the statements in the PowerPoints, and in light of the IPLs, IBM had an "obligation" not to "cap" the commission for salespeople like Mr. Choplin and Mr. Mallon; (2) salespeople like Mr. Mallon were entitled to rely on the statements in the PowerPoints that their commissions would be not be "capped," and that reliance was understood by IBM and was reasonable; and (3) what IBM in fact did, when it reduced the commissions in the way that it did for Mr. Choplin and Mr. Mallon, was "capping."  For example:

    a.   IBM testified as follows:

> Q.  The fourth bullet point, you could read that, please.
>
> A.  "Earnings opportunity remains uncapped."
>
> Q.  Okay. So you would agree that IBM when explaining his compensation plan for the first half of 2015 represented to Bobby Choplin that his earnings opportunity remains uncapped, wouldn't you?
>
> A.  Correct.
>
> Q.  Would you also agree that IBM represented to Bobby Choplin regarding his first half of 2015 compensation plan that payments were uncapped?
>
> A.  Correct.
>
> Q.  So would you agree that IBM had an obligation not to cap Bobby Choplin's earnings opportunity?
>
> A.  Yes.
>
> Q.  Would you agree that IBM had an obligation not to cap Bobby Choplin's payments?
>
> A.  Correct.

(Exhibit A, pp. 18-19.)  When asked specifically about whether a salesperson could reasonably rely on the statements in the PowerPoints, IBM testified:

> Q.  And it would be reasonable for a salesperson like Bobby Choplin to rely on the information in Exhibit 65, 66 and 67 [PowerPoints] regarding their compensation plan?
>
> A. Yes.

(Exhibit A, pp. 67-68.)

b.  Mr. Batthany testified as follows about the statements in the PowerPoint that commission would be not be capped:

> Q.  Okay. It would be reasonable for someone to understand that their commission payments were uncapped in the first half of 2015, wouldn't it?
>
> A. Yes.

(Exhibit B, p. 79.)  Mr. Dorsey similarly testified that, if he were a salesperson and read the statements in the PowerPoint, he would think that his earnings were uncapped. (Exhibit D, p. 48.)

c.  Ms. Maleki testified as follows about what exactly constitutes capping:

> Q. What does that mean to you?
>
> A. Capped?
>
> Q. Right.
>
> A. Is when your commissions get reviewed, and you know, you're supposed to get paid X amount, but you get paid Y.
>
> Q. Something different than what your commission formula would produce?
>
> A. Correct.

(Exhibit D, p. 25.)

d.  Mr. Dorsey straight-up testified that IBM's statements in the PowerPoints that it did not cap were not true, and that IBM often capped:

Q. Okay. Would you agree that under the commissions programs at IBM while you were there from the 2013 to 2015, that a software salesperson's earnings opportunity was uncapped?

A. No. I don't think any -- I don't think since I was there that their earnings were ever uncapped.

…

Q. And you see that each of these under the earnings opportunity block on the left side of the page, the third bullet point says, "Earnings opportunity remains uncapped"?

A. I do see that.

Q. And that's each of these four, on page 83, page 84, page 85, page 86, every single one of these says, "Earnings opportunity remains uncapped"; is that correct?

A. That's what I'm seeing, yeah.

Q. But that's not true from what you remember at IBM?

A. That's correct. I don't believe that's true.

(Exhibit D, pp. 43, 46-47.)

42.    The Choplin Depositions also make clear that, despite IBM's claim that it did not "cap" Mr. Choplin's commission when it reduced his commission payments, IBM employees used that exact term several times in emails when discussing the reduction in Mr. Choplin's commission payments. Upon information and belief, IBM, when referring to its reduction of Mr. Mallon's commission payments, also referred to what it was doing as "capping," "capped," "cap," or the like, including in emails sent during the period when IBM reduced Mr. Mallon's commission.

43.    Indeed, an email was produced in the Choplin case where Randolph Moorer specifically "recommend[ed] capping" the commissions of another sales representative, Mr. Stephenson, commissions on both the LabCorp and BB&T Deals by approximately $600,000.

(**Exhibit E**).  Upon information and belief, there are other such emails where IBM discussed how it was "capping" Mr. Mallon's commissions.

44.     Another case pending in the Middle District of North Carolina that is very similar to this one and that has yielded discovery is <u>William Stephenson v. International Business Machines Corporation</u>, No. 17-cv-1141 ("the Stephenson Action").  Upon information and belief, the plaintiff in the Stephenson Action had an IPL that was in relevant part identical or substantially similar to Mr. Mallon's IPL, and the plaintiff was shown a PowerPoint presentation that was in relevant part identical or substantially similar to the PowerPoint presentation shown to Mr. Mallon. Furthermore, upon information and belief, many of the other facts and circumstances surrounding the commissions due to Mr. Stephenson, and what IBM actually paid him and why, are similar to the facts and circumstances surrounding the commissions due to Mr. Mallon, and what IBM actually paid him and why.

45.     In the Stephenson Action, the plaintiff took four depositions: (1) a Rule 30(b)(6) deposition of IBM, through corporate designee Richard Martinotti (**Exhibit F**); (2) a deposition of Mr. Stephenson's first-line (i.e., immediate) manager, Benjamin Blackwell (**Exhibit G**); (3) a deposition of Mr. Stephenson's second-line (i.e., two levels up) manager, Cleo Clarke (**Exhibit H**); and (4) a deposition of Randolph Moorer, a high-level IBM executive (**Exhibit I**).  Together, Exhibits F, G, H, and I are referred to as the "Stephenson Depositions."

46.     The witnesses in the Stephenson Depositions, including Mr. Martinotti on behalf of IBM, re-affirmed the truth of the key testimony and admissions in the Choplin Depositions, including those portions quoted above.

47.     Furthermore, Mr. Martinotti testified that much of his testimony in the Choplin case would "apply equally" in Stephenson's case because the relevant facts—the PowerPoints, the

IPLs, and how and why IBM reduced commissions, etc.—were the same in both cases. The relevant facts in this case are same as those in both the Choplin case and the Stephenson case, and thus the Choplin Depositions and the Stephenson Depositions "apply equally" here.

48. The Stephenson Depositions establish the following facts, among many others: (a) the PowerPoint had key information about commissions that was not in the IPL, it had more specific information than the IPL, its notes stated that it the "primary" source for information about the commissions plan, and IBM itself has testified that the PowerPoint contains "the most detailed information" about a salesperson's commission plan; (b) the witnesses testified that IBM does not lie, and therefore that it is reasonable for salespeople to believe what IBM says—including its representation in the PowerPoint that "earnings opportunities" and "payments" were "uncapped"; (c) in fact, IBM testified that salespeople can "take that to the bank" when IBM says that it does not cap and that it's "not foolish" for them to believe that, and that IBM has an "obligation" not to cap as a result; (d) internal IBM emails stated many times that IBM was "capping" Stephenson when it reduced his commissions as it did; (e) nowhere did IBM ever define "cap," although the witnesses testified that "capping" can occur when IBM reduces a commission on one specific deal; (f) IBM admitted that, at the very least, "reasonable minds could differ about how they use or understand the term 'cap' or 'capping'"; (g) IBM reduced Stephenson's commissions in order to satisfy a secret internal budget of commissions, based on a percentage of a deal's revenue—that is, the sole reason that Stephenson's commissions were reduced and the amount of the reduction were both based only on IBM's desire to reduce the amount of commissions payable to satisfy the budget; (h) IBM focused on the "high earners" and "high achievers" when deciding whom to cap, and not, for example, on those who worked less hard relative to their peers or whose commission was disproportionate to their work; (i) IBM did not purport to cap or actually cap Mr. Stephenson

based on the Significant Transactions Provision of the IPL (j) one of the witnesses testified that what IBM did to Stephenson surprised her and did not "make sense" to her; (k) Martinotti, on behalf of IBM, testified that he did not see the emails about the reasons for Mr. Stephenson's commissions reduction until his deposition and that he did not "agree" with capping to stay on budget and that doing so would be "questionable"; and (l) Mr. Stephenson's commissions were actually "earned" under the terms of the IPL when he was capped.

49.     The testimony in the prior paragraph applies equally to Mr. Mallon, and in any event Mr. Mallon alleges that: (a) he was reasonable to rely on IBM's promise that it would not cap him; (b) when IBM reduced his commission, it "capped" him, just like Mr. Stephenson was capped, and that internal emails and testimony from IBM will confirm as much; (c) IBM capped him to meet a budget or otherwise only to reduce the amount that it had to pay in commissions; and (d) IBM did not purport to rely on or actually comply with the "Significant Transactions Provision" of the IPL.

50.     Another case pending, in the Northern District of California, that is very similar to this one and that has yielded discovery is David Swafford v. International Business Machines Corporation, No. 18-cv-4916 ("the Swafford Action").  Upon information and belief, the plaintiff in the Swafford Action had an IPL that was in relevant part identical or substantially similar to Mr. Mallon's IPL, and the plaintiff was shown a PowerPoint presentation that was in relevant part identical or substantially similar to the PowerPoint presentation shown to Mr. Mallon. Furthermore, upon information and belief, many of the other facts and circumstances surrounding the commissions due to Mr. Swafford, and what IBM actually paid him and why, are similar to the facts and circumstances surrounding the commissions due to Mr. Mallon, and what IBM actually paid him and why.

14

51.     In the Swafford Action, the plaintiff took four depositions: (1) a Rule 30(b)(6) deposition of IBM, through corporate designee Richard Martinotti (**Exhibit J**); (2) a deposition of Mr. Stephenson's first-line (i.e., immediate) manager, Mark Briggs (**Exhibit K**); (3) a deposition of Mr. Stephenson's second-line (i.e., two levels up) manager, Richard Wirtenson (**Exhibit L**); and (4) a deposition of Donald Leeke, a high-level IBM executive (**Exhibit M**).  Together, Exhibits J, K, L, and M are referred to as the "Swafford Depositions."

52.     The witnesses in the Swafford Depositions, including Mr. Martinotti on behalf of IBM, re-affirmed the truth of the key testimony and admissions in the Choplin Depositions and the Stephenson Depositions, including those portions quoted above.

53.     Furthermore, Mr. Martinotti testified that much of his testimony in the Choplin case and the Stephenson case would "apply equally" in Swafford's case because the relevant facts— the PowerPoints, the IPLs, and how and why IBM reduced commissions, etc.—were the same in both cases.  The relevant facts in this case are same as those in both the Choplin case and the Stephenson case, and thus the Choplin Depositions and the Stephenson Depositions "apply equally" here.

54.     The Swafford Depositions establish facts that are similar or identical to those established in the Choplin Depositions and Stephenson Depositions, at outlined above.  Most importantly, they establish: (a) that Swafford was reasonable in relying on IBM's representation that it would not "cap" his commission; and (b) that IBM "capped" him when they reduced his commissions.

55.     The key testimony in the Swafford Depositions applies equally to Mr. Mallon, and in any event Mr. Mallon alleges that: (a) he was reasonable to rely on IBM's promise that it would not cap him; (b) when IBM reduced his commission, it "capped" him, just like Mr. Swafford was

capped, and that internal emails and testimony from IBM will confirm as much; (c) IBM capped him to meet a budget or otherwise only to reduce the amount that it had to pay in commissions; and (d) IBM did not purport to rely on or actually comply with the "Significant Transactions Provision" of the IPL.

56.    In short, of all of the cases alleging facts similar to those alleged in this case, three have yielded significant discovery. In all three cases, the discovery has shown that the key facts alleged were in fact true—and those facts apply equally in this case.

57.    Mr. Mallon has met all conditions precedent to the bringing of this action.

### FIRST CLAIM FOR RELIEF
**(Fraudulent Misrepresentation)**

58.    Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

59.    IBM, through its agents, represented to Mr. Mallon that Mr. Mallon's commission would not be capped, in at least the following instances: (1) the PowerPoint, which, upon information and belief, was sent to Mr. Mallon both before and after he accepted his 2015, 2016, and 2017 IPLs, and was always available via the intranet; and (2) the statements of IBM executives at sales meetings that commissions would not be capped. Furthermore, IBM also stated the following to Mr. Mallon about his commissions in the first half of 2017: (1) that he was estimated to earn only $695,000 if he declined to move to the TAAP, which was less than the $744,000 bucket of commissions under the TAAP, all of which he would earn if he switched to the TAAP; and (2) that he would be the only person getting any of the bucket of money under the TAAP if he switched to the TAAP.

60.    All of the above representations were false.

61.     Upon information and belief, those representations were false when made and IBM, through its agents, knew that they were false when made. IBM intended to deceive Mr. Mallon in making those misrepresentations. Simply put, IBM knew that Mr. Mallon's commissions might be and would be capped, even though it told him in all of these instances that they would not be capped, and it knew that Mr. Mallon would or very likely would earn less by switching to the TAAP and that the bucket of money under the TAAP would or very likely would be shared by other people.

62.     Mr. Mallon reasonably and justifiably relied on the representations of IBM. Notably, some or all of the representations were made after Mr. Mallon signed the IPL, including those in the PowerPoint, those by IBM executives in sales meetings, and those about switching to the TAAP. Mr. Mallon reasonably and justifiably relied on the representations by, among other things, continuing to work hard and sell as much software and services as possible for the benefit of IBM. Had Mr. Mallon known that he would not be paid what he was promised and what he expected, he would have worked differently at IBM, in commensuration with his actual compensation, and/or he would have sought another job that paid him what his efforts were worth and/or did not cap commissions. Had Mr. Mallon known that he would be capped as he was, he would have worked his deals differently at IBM so as to maximize his compensation.

63.     Mr. Mallon was damaged by IBM's fraudulent statements in an amount exceeding $75,000 when it failed to pay him the full amount of the TAAP commissions pool at the end of July 2017 as it should have.

### SECOND CLAIM FOR RELIEF
#### (*Quantum Meruit*)

64.     Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

65.     Mr. Mallon rendered valuable consideration to IBM, in the form of work performed to close all of the deals, for which he has not been paid. The consideration has a reasonable value of *at least* $350,000, although the exact amount is for the jury.

66.     At the time that Mr. Mallon performed the work, he reasonably expected to be paid by IBM.  IBM received and benefited from the work with knowledge or reason to know that Mr. Mallon expected to be paid. IBM voluntarily accepted the benefit of the work and kept the benefits therefrom without waiving, refusing, or returning the benefit.

67.      Mr. Mallon is entitled under the doctrine of *quantum meruit* to recover damages from IBM in the amount of *at least* $350,000, or according to proof at trial.

## THIRD CLAIM FOR RELIEF
### (Unjust Enrichment)

68.     Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

69.     At the specific request of IBM and for its use and benefit, Mr. Mallon has performed work for IBM in the form of making sales of its software and services.

70.     The value of the work performed for IBM by Mr. Mallon for which Mr. Mallon has not been paid is *at least* $350,000, although the exact amount is for the jury.

71.     During and since the performance of the work by Mr. Mallon, IBM has failed to pay Mr. Mallon and there is due and owing to Mr. Mallon from IBM, a principal sum amount of *at least* $350,000.

72.     Despite Mr. Mallon being owed in excess of another $350,000, IBM has failed and refused to pay the same or any part of it.

73.     As a result of IBM's refusal to pay Mr. Mallon the above-stated sum due and owing to Mr. Mallon, IBM has become unjustly enriched in the amount of *at least* $350,000, according to proof at trial.

## FOURTH CLAIM FOR RELIEF
### (Alternative Claim – Constructive Fraud)

74.     Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

75.     Mr. Mallon alleges this claim in the alternative to the claim for fraudulent misrepresentation.

76.     IBM, through its agents, represented to Mr. Mallon that IBM did not have an existing policy of capped commissions, that Mr. Mallon's commission would be calculated at $744,000 if Mr. Mallon agreed to convert the USMC Deal to TAAP, compared to the $695,000 that he was expected to receive under his regular commission, and that he was the only person getting commissions under the TAAP for the USMC Deal. These representations were false and involve present and preexisting material facts regarding the fact that IBM had a preexisting policy on capped commissions, that the actual commission rate to which Mr. Mallon would be entitled was not $744,000, and the fact that there were others who would share the commissions for the USMC Deal under the TAAP.

77.     IBM's agents negligently or innocently made the foregoing misrepresentations, without exercising the care that a reasonable person would exercise in the circumstances. IBM made the representations with the knowledge and intention that Mr. Mallon rely on the statements, and Mr. Mallon reasonably and justifiably relied on the representations of IBM.

78.     Mr. Mallon reasonably and justifiably relied on the misrepresentations by agreeing to switch the USMC Deal to a TAAP and continuing to work hard and sell as much software and services as possible for the benefit of IBM.

79.     Had Mr. Mallon known that he would not be paid what he was promised and what he expected, he would have worked differently at IBM, in commensuration with his actual compensation, and/or he would have sought another job that paid him what his efforts were worth and/or did not cap commissions. Had Mr. Mallon known that he would be capped as he was, he would have worked his deals differently at IBM so as to maximize his compensation.

80.     IBM owed Mr. Mallon a duty of care in making the representations.

81.     Mr. Mallon reasonably and justifiably relied on the representations of IBM.

82.     Mr. Mallon was damaged by IBM's negligent or innocent misrepresentations.

83.     Mr. Mallon has been damaged by IBM's negligent or innocent misrepresentation in an amount exceeding $75,000.00.

### FIFTH CLAIM FOR RELIEF
**(Punitive Damages)**

84.     Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

85.     The actions and conduct of IBM, as set forth herein, entitle Mr. Mallon to compensatory damages, and are accompanied by aggravating factors which show such willful or wanton behavior on the part of IBM, and with such recklessness or negligence as to evince a total conscious disregard of the rights of others, all of which caused and relate to Mr. Mallon injuries as claimed herein.

86.     This conduct, as set forth herein, includes, among other things, fraud.

87.     IBM facilitated the conduct constituting fraud and the willful, wanton, and outrageous conduct, with a total conscious disregard of the rights of others, giving rise to punitive damages, as set forth herein and as may be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Mallon prays the Court for the following relief:

1.      Mr. Mallon have and recover from IBM for fraudulent misrepresentation in the amount exceeding $75,000;

2.      In the alternative, that Mr. Mallon have and recover from IBM for *quantum meruit* or unjust enrichment in an amount to be determined at trial, plus interest on the judgment until paid in full at the legal rate as allowed by law;

3.      Mr. Mallon have and recover from IBM for constructive fraud in the amount exceeding $75,000;

4.      That Mr. Mallon be awarded punitive damages;

5.      That all costs of this action be taxed against IBM; and

6.      That the Court award Mr. Mallon such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

PLAINTIFF DEMANDS A TRIAL BY JURY.

Dated: July 22, 2019                                  Respectfully submitted,


/s/ David Hilton Wise
David Hilton Wise, VA Bar No. 30828
John J. Drudi, VA Bar No. 86790
WISE & DONAHUE, PLC
10476 Armstrong Street
Fairfax, Virginia 22030
Tel: (703) 934-6377
Fax: (703) 934-6379
dwise@wisedonahue.com
jdrudi@wisedonahue.com

Matthew E. Lee*
N.C. State Bar No. 35405
Jeremy R. Williams*
N.C. State Bar No. 48162
**WHITFIELD BRYSON & MASON, LLP**
900 W. Morgan Street
Raleigh, NC 27603
Telephone:     (919) 600-5000
Facsimile:     (919) 600-5035
matt@wbmllp.com
jeremy@wbmllp.com

Mark R. Sigmon*
N.C. State Bar No. 37762
**SIGMON LAW, PLLC**
5 West Hargett Street, Suite 1001
Raleigh, North Carolina 27601
Telephone:     (919) 451-6311
Fax:                 (919) 882-9057
mark@sigmonlawfirm.com

*Attorneys for Plaintiff*

* to be admitted *pro hac vice*

22